UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| BRITTANY THOMAS, | : : : : | Civil Action No. |
| Plaintiff, | : : | **PLAINTIFF REQUESTS A TRIAL BY JURY** |
| -vs- | : : | |
| | : | **COMPLAINT** |
| READING HOSPITAL; CLIFFORD REED;: PAMELA MARRERO; NELAH DIADDEZIO; CRYSTAL NAGLE.; and LISA GOOCH, individually, | : : : : : | |
| Defendants | : : : | |

Plaintiff, BRITTANY THOMAS ("Plaintiff" and/or "THOMAS"), by and through undersigned counsel hereby files this Civil Action Complaint against Defendants, READING HOSPITAL, ("Defendant" and/or "READING"); CLIFFORD REED; PAMELA MARRERO; NELAH DIADDEZIO; CRYSTAL NAGLE; and LISA GOOCH, individually, and upon information and belief avers the following:

**<u>NATURE OF THE CASE</u>**

Plaintiff brings this action against Defendants for race, color, and sex discrimination, as well as retaliation and hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951, et seq. ("PHRA"). Plaintiff was subjected to unequal treatment, discriminatory actions, and harassment by supervisors and coworkers based on her race, color, and sex/gender, and suffered sexual and racial harassment.  Plaintiff further experienced retaliation for reporting or opposing the discriminatory conduct. As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered lost wages, emotional distress, lost

employment opportunities, and other damages, for which she seeks relief under Title VII, 42 U.S.C. § 1981 and the PHRA.

## JURISDICTION AND VENUE

1. This action arises under federal and state law, including Title VII, 42 U.S.C. § 1981 ("Section 1981"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951, et seq. ("PHRA"), as Plaintiff alleges race, color, and sex discrimination, hostile work environment, and retaliation.

2. This Court has subject matter jurisdiction over Plaintiff's claims arising under federal law under 28 U.S.C. § 1331.

3. The Court has supplemental jurisdiction over the forthcoming claims arising under Commonwealth law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in the Eastern District of Pennsylvania, as Plaintiff was employed by Defendant and performed her work in Philadelphia County, Pennsylvania, where the discriminatory and retaliatory conduct occurred.

5. Around April 29, 2025, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was dual-filed with the Pennsylvania Human Relations Commission ("PHRC"), alleging race, color, and sex discrimination, hostile work environment, and retaliation.

6. On January 13, 2026, the EEOC issued a Notice of Right to Sue, permitting Plaintiff to file this action and completing her exhaustion of administrative remedies under Title VII.[1]

## PARTIES

---

[1] Plaintiff's claims arising under 42 U.S.C. § 1981 contain no similar requirement of administrative exhaustion. As Plaintiff's analogous claims arising under the PHRA will not become ripe until at least one year has passed since the filing of the Charge, Plaintiff reserves her right to amend this Complaint to include such claims once they have done so.

7. Plaintiff BRITTANY THOMAS ("PLAINTIFF" or "THOMAS"), is an individual adult female who resides in the Commonwealth of Pennsylvania.

8. Defendant READING HOSPITAL (hereinafter referred to as "Defendant" and/or "READING") was and is a domestic nonprofit corporation created under and authorized to do business pursuant to the laws of the Commonwealth of Pennsylvania

9. Defendant READING maintains a headquarters with an address of 420 South Fifth Avenue, West Reading, PA 19611.

10. At all times material, Defendant READING operated and continues to operate a medical center in the county of Berks called the "Reading Hospital" located at 420 South Fifth Avenue, West Reading, PA 19611.

11. At all times material, Defendant READING employed Claimant at its Reading Hospital medical center.

12. At all times material, Defendant Dr. CLIFFORD REED ("REED") was employed by Defendant READING as a Neurologist, specializing in multiple sclerosis care.

13. At all times material, Defendant PAMELA MARRERO ("MARRERO") was employed by Defendant READING as a Clinical Research Coordinator.

14. Defendant NELAH DIADDEZIO ("DIADDEZIO") was employed by Defendant READING as an Operations Manager until approximately November 2023.

15. Defendant CRYSTAL NAGLE ("NAGLE") was employed by Defendant READING as an Operations Manager between approximately November 2023 and July 2024.

16. Defendant LISA GOOCH ("GOOCH") was and continues to be employed by Defendant READING as an Operations Manager from approximately July 2024 to the present.

### MATERIAL FACTS

17. Around January 31, 2023, Claimant began working for Defendant READING as a Clinical Trials Nurse.

18. In that role, Claimant often worked closely with Defendant REED and directly reported to the Operations Manager of her department, a position which was held at varying times by Defendants DIADDEZIO, NAGLE, and GOOCH.

19. Claimant had an excellent work history with Defendant and performed her job to the best of her ability at all times.

**Racial Harassment and Discrimination and Defendants' Indifference**

20. Despite Claimant's strong work performance, Defendants soon began a campaign of targeted racial harassment towards her including racial jokes and demeaning slurs.

21. In particular, Defendant MARRERO quickly began targeting Claimant with pervasive, odious comments in a transparent attempt to convince her to quit the position.

22. MARRERO would regularly make snide comments about Claimant on the basis of her race, and quickly escalated to using the word "**nigger**" to describe Claimant.

23. MARRERO would both used the word "nigger" directly to Claimant and also would refer to her as the same in conversations with other people.

24. By means of example, on one occasion when MARRERO was out of the office, a coworker named Christine Chen ("Chen") confided to Claimant that on at least one occasion, MARRERO had told Chen that she wanted Claimant gone from the job and further stated to her that she "**[didn't] want any niggers in the office**" in reference to Claimant.

25. Accordingly, after one particularly offensive interaction with MARRERO in which she called Claimant a "nigger" to her face, Claimant duly reported the ongoing and distressing harassment to her direct supervisor, Defendant DIADDEZIO.

26. However, DIADDEZIO did little in response other than promising that she would "talk to" MARRERO and that it "wouldn't happen again."

27. Despite DIADDEZIO's reassurances, MARRERO's conduct continued fully unabated.

28. Accordingly, feeling helpless given that she had reported to her direct supervisor and nothing had been done, Claimant simply tried to continue to do her best in the face of the ongoing harassment, often telling MARRERO to stop her harassing comments, but MARRERO would typically roll her eyes in response and ignore her.

29. MARRERO also continued to blatantly talk about Claimant with other employees such as Maryellen "Ellie" Alderfer and would make disparaging comments about her due to her race.

30. When Defendant DIADDEZIO left her position around November 2023, Defendant NAGLE became Claimant's new direct supervisor.

31. Accordingly, Claimant was hopeful that she could convince NAGLE to step in and get MARRERO to stop her constant harassment, but NAGLE (who upon information and belief was close friends with MARRERO) was similarly uninterested in responding to Claimant's reports or taking any meaningful action after Claimant informed her of what had been occurring at Reading Hospital.

32. Similarly to DIADDEZIO, NAGLE only vaguely listened to Claimant's clear and unequivocal reports of unacceptable behavior and harassment by MARRERO and wholly failed to take action as a supervisor.

33. In response to Claimant reporting to her the details of what MARRERO had been constantly subjecting her to, NAGLE stated that the behavior was unacceptable and that it would stop, but took no further action.

34. Accordingly, MARRERO was once again given free rein to continue harassing and targeting Claimant.

35. Around July 2024, Defendant NAGLE also left her position, and Defendant GOOCH became Claimant's new direct supervisor.

36. Once again, Claimant reported to her supervisor, GOOCH, about MARRERO's constant unacceptable harassment, but similarly, Defendants took no action to stop it.

37. MARRERO's actions continued throughout Claimant's tenure with Defendants, even after she returned from her medical leave (discussed further below) around November 2024.

38. Notably, no action whatsoever has been taken against MARRERO since Claimant began her reports.

**Sexual Harassment by Dr. Clifford Reed Leading to Claimant's Mental Breakdown**

39. Unfortunately, while Defendants' unchecked racial harassment and blatant indifference to Claimant's hostile working environment are shocking and unquestionably unacceptable on their own, Defendants' discriminatory, harassing, and retaliatory behavior pertaining to Claimant's employment extended dramatically beyond such conduct.

40. Defendant Dr. CLIFFORD REED, a long-tenured neurologist employed by Reading Hospital, targeted Claimant for extreme sexual harassment from the beginning of Claimant's employment.

41. Defendant REED behaved openly and notoriously with his targeted sexual harassment of Claimant within the workplace, which included but was not limited to kissing Claimant on her neck, touching her breasts, buttocks, and vaginal area, and making sexual jokes.

42. REED would state that he "ha[d] a potty mouth" and that he had been accused of sexual harassment in the past, but was not worried about because he "could retire if [he] wanted to" if anything happened, given his substantial tenure at READING.

43. While Claimant fully admits to participating in a brief sexual relationship with Defendant REED following his initial pursuit of her and associated graphic harassment, REED's harassment began (and continued) far outside of the bounds of their relationship despite Claimant's clearly demonstrated desires to end any and all further relationships outside of their professional obligations.

44. Even before the brief relationship between Claimant and REED, REED would make constant sexual comments to her at work, including but not limited to "nice ass," "nice butt," "I'd love to stick my dick inside of you" and "I want to eat you."

45. To be clear, the above are only a very brief example of the *many* sexual comments regularly made to Claimant by Dr. Reed.

46. Reed's sexual interest in Claimant was apparent even to other coworkers at READING. For example, one one occasion, Defendant DIADDEZIO remarked to Claimant that Reed was a "strange bird" and that he "seemed to like [her.]" DIADDEZIO also commented on the frequency with which Reed would call Claimant to his office.

47. Claimant and Dr. Reed's relationship began around May 2023, after Reed asked her to accompany him to dinner during a work event in which they were both participating.

48. Soon after, Dr. Reed began inviting Claimant to accompany him on numerous vacations, including international cruises.

49. Claimant and Dr. Reed thereafter engaged in a casual sexual relationship until approximately the fall of 2023, during which Claimant accompanied Dr. Reed on multiple cruise trips and vacations.

50. Around August 2023, Claimant first expressed to Dr. Reed that she wanted to end the relationship as she was unhappy with his behavior and how it was affecting her professional work environment.

51. Despite Claimant's unequivocal desire to end any further sexual relationship, Dr. Reed continued to pursue her and sexually harass her both in the workplace and via text message.

52. In particular, Dr. Reed insisted that Claimant still accompany him on pre-booked cruises taking place the following December and June.

53. In an effort to placate Dr. Reed and feeling obligated to do so in order to avoid professional repercussions, Claimant reluctantly agreed to do so, on the conditions that he stop making sexual advances at her and secure separate beds for the trips.

54. During the following months through summer of 2024, Claimant repeatedly asked Dr. Reed to keep their relationship professional and to stop making sexual comments to her; however, he refused to do so.

55. However, Dr. Reed not only refused to cease his behavior, but instead dramatically escalated it and continued to harass Claimant via text and in person.

56. Dr. Reed would constantly send text messages to Claimant during this time attempting to pressure her into resuming a sexual relationship with him, as well as discussing other graphic sexual topics that were wholly unrelated to their professional relationship.

57. Even when discussing wholly mundane subjects, Dr. Reed would constantly find ways to insert sexual jokes, innuendos, and comments into his text messages with Claimant.

58. Accordingly, around August 2024, Claimant felt so distressed and upset by the constant, unrelenting sexual harassment from Dr. Reed that she had no choice but to take leave

under the Family and Medical Leave Act ("FMLA") in an attempt to protect her rapidly deteriorating mental health.

**Defendants' Retaliation against and Constructive Termination of Claimant**

59. Claimant returned from her medical leave of absence around November 2024.

60. When she did so, Defendants instructed her to meet with GOOCH, her new manager.

61. Claimant accordingly met with GOOCH and informed her of Defendants' history of harassment and discrimination, including both the constant racial harassment by MARRERO as well as REED's unrelenting sexual harassment that had forced her to take FMLA leave in order to protect her mental health.

62. Following that meeting, GOOCH advised Claimant that she needed to meet with Human Resources, including Defendants' "H.R. Business Partner" Sandra Morris ("Morris.")

63. When Claimant did so, Morris suddenly alleged that an audit conducted prior to Claimant's medical leave had turned up numerous serious issues pertaining to Claimant's work.

64. This was shocking for Claimant to hear, as she had fully participated in the audit prior to her leave and had already received strongly positive feedback from the auditor.

65. Despite such, Defendants then presented Claimant with what was essentially a "Hobson's Choice": she could either take a different job (in actuality, a demotion) to a "Case Manager" role with drastically reduced pay and fewer responsibilities despite her substantial 14-year experience as a specialized Clinical Research nurse, or she could find a new position within Defendant's health system on her own within thirty (30) days. If neither of those options were exercised, Claimant was expected to "resign."

66. Morris and Gooch also informed Claimant that if she were to stay employed with Defendant READING, she would need to take an approximately six to eight week course

as well as an accompanying test to "prove" that she was able to perform her job, once again despite Claimant's excellent work history and substantial experience in her field.

67. Defendants' actions were blatantly calculated to try to further push Claimant out of her role.

68. Accordingly, around December 23, 2024, as Claimant had been unable to find any other open positions within the health system, she advised Defendant of her "resignation" which was quite clearly a barely disguised constructive termination.

69. Defendant's conduct constituted unlawful retaliation. Plaintiff engaged in protected activity by opposing sexual harassment and sex discrimination, and race discrimination and filing formal complaints, yet Defendant punished her by suspending and then terminating her, while protecting the harassers.

70. Defendant's failure to act deprived Plaintiff of a workplace free from racial sexual harassment and retaliation, in violation of the PHRA and Section 1981.

71. As a direct and proximate result of Defendant's actions, Plaintiff suffered severe emotional distress, humiliation, anxiety, depression, and loss of wages and employment benefits. Plaintiff required therapy and experienced daily physical symptoms of stress, including knots in her stomach before work.

72. Defendants acted with malice and reckless indifference to Plaintiff's federally protected rights, thereby warranting the imposition of punitive damages.

73. Plaintiff was essentially terminated from her position and was never asked to return to work following her suspension.

74. Plaintiff was subjected to unequal treatment, harassment, and retaliation based on her race, color, and sex.

75. Defendant failed to maintain a workplace free from hostility, failed to adequately investigate Plaintiff's complaints of harassment and sexual harassment, and retaliated against Plaintiff for opposing discriminatory conduct.

76. As Defendant's conduct has been malicious, willful, outrageous and conducted with full knowledge of the law, Plaintiff demands punitive damages against all Defendants, jointly and severally.

77. Plaintiff is seeking emotional damages related to Defendants' unlawful discrimination.

78. Upon a successful verdict, Plaintiff will seek attorney's fees from Defendants.

79. The above are just some of the examples of unlawful discrimination and retaliation to which the Defendants subjected Plaintiff.

80. Defendants have established a pattern and practice of discrimination in their workplace.

**COUNT I**
**RACE DISCRIMINATION AND HARASSMENT UNDER 42 U.S.C. § 1981**
**(*As against all Defendants*)**

81. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

82. 42 U.S.C. § 1981 states in relevant part as follows:

(a) Statement of equal rights: all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. (b) "Make and enforce contracts" defined for purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.A. § 1981.

83. Defendant discriminated against Plaintiff on the basis of her race by subjecting her to unlawful employment actions, including but not limited to termination, on the basis of her race.

84. Defendants also subjected Plaintiff to a hostile work environment in violation of § 1981 by subjecting her to unwanted severe and pervasive conduct on the basis of her race that materially affected her terms and conditions of employment.

85. Plaintiff makes claims for all damages available to her as a result of Defendant's unlawful discrimination.

## COUNT II
## RETALIATION UNDER 42 U.S.C. § 1981
### (*As against all Defendants*)

86. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

87. Defendants further violated 42 U.S.C. § 1981 by subjecting Plaintiff to retaliation in response to her protected complaints and opposition to Defendants' unlawful discriminatory conduct on the basis of her race, including but not limited to denying Plaintiff like privileges of employment by terminating Plaintiff's employment.

88. Plaintiff makes claims for all damages available to her under 42 U.S.C. § 1981 as a result of Defendants' retaliation.

## COUNT III
## DISCRIMINATION UNDER TITLE VII
### (*As against Defendant Reading*)

89. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

90. Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e-2, states in relevant part that: "(a)Employer practices - It shall be an unlawful employment practice for an employer—(1)to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

91. Defendant discriminated against Plaintiff by subjecting her to unlawful employment practices, including but not limited to disparate treatment and termination on her basis of her race and sex.

92. Plaintiff accordingly makes claims for all damages available to her against Defendant under Title VII.

## COUNT IV
## HOSTILE WORK ENVIRONMENT UNDER TITLE VII
### (*As against Defendant Reading*)

93. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

94. Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e-2, states in relevant part that: "(a)Employer practices - It shall be an unlawful employment practice for an employer—(1)to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

95. Defendant also subjected Plaintiff to a hostile work environment in violation of Title VII by subjecting her to unwanted severe and pervasive harassing conduct on the basis of her race and sex that materially affected her terms and conditions of her employment.

96. Plaintiff accordingly makes claims for all damages available to her against Defendant under Title VII.

### COUNT V
### RETALIATION UNDER TITLE VII
### (*As against Defendant Reading*)

97. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

98. Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e-3, states in relevant part that: (a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

99. Defendant violated Plaintiff's rights by subjecting Plaintiff to retaliation in response to her protected complaints and opposition to Defendants' unlawful discriminatory conduct on the basis of her race and sex, including but not limited to denying Plaintiff like privileges of employment by terminating Plaintiff's employment.

100.   Plaintiff accordingly makes claims for all damages available to her under Title VII.

### JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants, in an amount to be determined at the time of trial plus interest, including but not limited to, all emotional distress, back pay, front pay, punitive damages, liquidated damages, statutory damages, attorney's fees, costs, and disbursements of action; and, for such other relief as the Court deems just and proper.

**FREUNDLICH & LITTMAN, LLC**
Attorneys for Plaintiff

By: */s/ Nathaniel N. Peckham, Esq.*
Nathaniel N. Peckham, Esquire
1425 Walnut Street, Suite 200
Philadelphia, PA 19102
P: (215) 545-8500
F: (215 545-8510
E: *nathaniel@fandllaw.com*

Dated: March 23, 2026